**UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. TURNER et al.**

**THE ADDISON E. BULLARD.**

(Circuit Court of Appeals, Fifth Circuit. March 8, 1926.)

No. 4727. ·

**1. Shipping ⚖49(7)—Evidence held insufficient to establish contract of United States Shipping Board Emergency Fleet Corporation to reimburse owner of sailing vessel for losses from interruption of voyage.**

Evidence *held* insufficient to establish contract whereby United States Shipping Board Emergency Fleet Corporation agreed to reimburse owner of sailing vessel for losses sustained because of interruption of voyage, caused by proclamation of President forbidding sailing vessels to enter war zone.

**2. Shipping ⚖55—Sailing vessel's release of part of cargo of oil to agents of charterer on interruption of voyage by President's proclamation held not consideration for alleged contract of Emergency Fleet Corporation.**

Sailing vessel's release of part of cargo of oil, which it already had on board, to charterers' agents, when voyage was interrupted by proclamation of President forbidding sailing vessels to enter war zone, *held* not legal consideration for alleged subsequent agreement of Shipping Board Emergency Fleet Corporation to ·reimburse owner of sailing vessel for losses sustained.

**3. Shipping ⚖55—Agreement by owner of sailing vessel not to sue agents of charterers held not legal consideration for alleged contract of Emergency Fleet Corporation to reimburse owner for losses sustained from interruption of voyage by presidential proclamation.**

Agreement by owner of sailing vessel not to sue agents of charterers for breach of charter party occurring when voyage was interrupted by President's proclamation forbidding sailing vessels to enter war zone *held* not legal consideration for alleged contract of Shipping Board Emergency Fleet Corporation to reimburse owner of sailing vessel for losses sustained, where charter party was subject to charterer obtaining a permit.

**4. Contracts ⚖72.**

Agreement not to litigate is not legal consideration for contract, unless a prima facie ground for litigation exists.

In Error to the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Action by Horace Turner, managing owner, and others, owners of the American schooner Addison E. Bullard, against the United States Shipping Board Emergency Fleet Corporation. Judgment for plaintiffs, and defendant brings error. Reversed, and cause remanded.

Thos. C. McClellan, Sp. Asst. Atty. Gen., Jos. W. John, Asst. U. S. Atty., of Mobile, Ala., and I. V. McPherson, Sp. Asst. Atty. Gen., for plaintiff in error.

Harry T. Smith, Wm. G. Caffey, and Wm. B. Inge, all of Mobile, Ala., for defendants in error.

Before WALKER and FOSTER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This was an action at law, brought in the District Court by the defendant in error as plaintiff against the plaintiff in error as defendant, for the recovery of damages for the breach of a contract alleged to have been entered into between the parties, the effect of which was to reimburse the plaintiff for losses sustained because of the interruption of a voyage of the Addison E. Bullard, a sailing vessel owned by the plaintiff, caused by a proclamation of the President, which became effective September 28, 1917, and which forbade sailing vessels thereafter to enter the war zone. The Addison E. Bullard was chartered to carry a cargo of lubricating oil from the United States to France; the real consignee being the republic of France. The firm of Lunham & Moore, of New York, was the agent of the charterers. The voyage of the Addison E. Bullard was made impossible by the prohibition of the proclamation. The trial resulted in a verdict for the plaintiff in the amount of $100,000, which this writ of error seeks to review.

The defendant, upon the trial in the District Court, denied the existence of any contract, contending that the minds of the parties had never met; that Amberg, the person who negotiated for the defendant, did not have authority to act for it, and, indeed, did not purport to act for it, but for the United States Shipping Board; and that, if there was a contract, it had no legal consideration. A brief statement of the facts will serve to illustrate the situation of the parties at the time of the negotiations:

When the voyage of the Addison E. Bullard became impossible, because of the proclamation of the President, the entire cargo, consisting of 8,500 barrels of oil, had already been delivered for carriage, and 660 barrels had actually been loaded on the ship. When notice of the termination of the charter was received by the owners of the Addison E. Bullard, the oil was redelivered to the agents of the charterers, Lunham & Moore, including that which had been loaded on the ship. After receiving the oil back, Lunham & Moore negotiated for its transportation to

France through Amberg, the representative of the Shipping Board, and secured it to be transported on a converted German steamship, which was operated by the United States Navy, and which had been renamed Pensacola, and it was in fact carried to France on the Pensacola. The oil passed out of the possession of the owners of the Addison E. Bullard prior to October 25, 1917. Lunham & Moore agreed with Amberg to pay the same freight rate ($19 per barrel) which had been agreed upon with the owners of the Addison E. Bullard, and to pay in addition the difference in the cost of insurance on the cargo, as between a sailing vessel and a steam vessel, which amounted to about $83,000. The owners of the Addison E. Bullard, although they had released the cargo of oil, when notified that the voyage of the Addison E. Bullard would not be permitted, asserted a claim against the charterers for the loss caused by the interruption of the voyage.

After the new contract for the transportation of the oil in the Pensacola had been entered into, and after the oil had been released to the charterers by the owners of the Addison E. Bullard, and was on the high seas on its way to France in the Pensacola, Amberg came to New York from Washington to confer with Lunham & Moore, arriving in New York on October 25th. At this conference, Amberg told one Gwinter, of the firm of Lunham & Moore, that the Shipping Board would be willing to consider an allowance to the owners of all the sailing vessels, the voyages of which had been interrupted by the proclamation of the President, as a deduction from the freight rate, of their actual expenses, provided Lunham & Moore could get the owners of the sailing vessels to release them for that consideration. No contract to make such an allowance was entered into between Amberg, for the Shipping Board, and Gwinter, representing Lunham & Moore.

In pursuance of the general purpose to settle the losses of the owners of sailing vessels on this basis, Amberg met the plaintiff, Horace Turner, in the office of Lunham & Moore, on October 25 or October 26, 1917 (Turner testified it was 10 days earlier), in the presence of Gwinter, and it was at this meeting that the plaintiff claims the contract sued on was made. There were two subsequent conferences between Turner and Amberg in November, but there is no claim that any contract was made at either. If there was a contract at all, it was by virtue of what took place between Turner and Amberg at their first meeting. The only witnesses who testified to that transaction were Amberg and Turner. Amberg denied that any contract either with Turner, acting for the owners of the Addison E. Bullard, or with Gwinter, acting for Lunham & Moore, was then made.

[1] If the plaintiff has established the making of a contract with either, it was by the testimony of Horace Turner as to what took place on that occasion. His evidence on direct examination is as follows:

"At the time of this visit of Mr. Amberg to New York, in the offices of Lunham & Moore, they having sent for me, Mr. Gwinter, of Lunham & Moore, said that Mr. Amberg was down for the Shipping Board to try to arrange this adjustment, and a joint conference ensued and Mr. Amberg said that the Shipping Board didn't want to lose these ships—that they were needed—and had decided to adjust this matter amicably, if they could, by having the charterers, in this case Lunham & Moore, pay all the money that would have been paid, had the shipment gone on the sailing vessel, $19 a barrel, and the difference between the steamer insurance, on whatever steamer it was lifted on, and the insurance on the sailing vessel, which we then did not know what the amount would be, excess insurance, we called it, into his hands, and that if we wouldn't resort to litigation the Shipping Board would pay our losses. * * * That was agreed upon between the three parties. It was as near agreed upon as I could understand anything."

The witness Turner on cross-examination testified as follows:

"They then got down to this other matter. Amberg said, if plaintiffs wouldn't litigate, and would release Lunham & Moore on the charter, they would pay our losses and collect from Lunham & Moore all these expenses, the exact amount it would have cost Lunham & Moore if they had shipped this cargo by the Bullard; in other words, all freight and the amount they were going to figure as difference in insurance. He told Mr. Amberg that he would go into it with the understanding that he would be just as well treated as Feeley Pendleton, who he said was an ornery cuss and not going to deal with them; that he expected to get just as good treatment at Amberg's hands for agreeing with him as Feeley Pendleton obtained by fighting. Amberg acquiesced—said that was reasonable, or words to that effect."

A vast amount of correspondence and other documentary evidence appears in the record, and the claim of plaintiff is that it

contains admissions of agents of the defendant of the existence of the contract. If the evidence of the participants in the conference, at which the contract is claimed to have been entered into, shows without conflict that no contract was made between the parties, it is clear that no subsequent admissions of agents of one of the parties, who were unacquainted with what happened at the conference, and which were merely narrative of the transaction relied upon to show the existence of a contract, could be considered evidence tending to show the existence of a contract, then and there made. However, we may say that our interpretation of the documentary evidence is that it clearly shows that neither of the parties to it believed or understood that they had theretofore made between themselves a binding agreement, or that their minds had ever at any time met upon the same terms of a contract.

The question, therefore, is as to whether the evidence of Turner as to what he says happened at the first conference between Amberg, Gwinter, and himself is testimony tending to show that a contract was there made, either between Lunham & Moore and the defendant, or between Turner and his associates, owners of the Bullard, and the defendant to pay the losses of the owners of the Bullard, sustained by the interruption of its voyage. It is manifest that there was no contract between Lunham & Moore and the defendants of any kind made at that time. The new contract for the transportation of the oil in the Pensacola had already been made. A mere suggestion by Amberg that the Shipping Board might consider making an allowance to the owners of the sailing vessels, as a class, out of the freight rate, to pay their expenses, clearly does not amount to a contract. The suggestion was coupled with a condition that Lunham & Moore secure a release from the owners of the sailing vessels for that consideration. No such release was ever secured from the owners of the Addison E. Bullard.

We think it equally clear that the evidence of Turner also fails to show any contract between himself and his associates and the defendant, or any meeting of minds upon a contract that had any definite terms. The part of his evidence that is relied upon to establish the agreement is "that, if we wouldn't resort to litigation, the Shipping Board would pay our losses." This is to be considered in connection with his subsequent testimony, on cross-examination, that "he told Mr. Amberg he would go into it

with the understanding that he would be just as well treated as Feeley Pendleton; that he expected to get just as good treatment at Amberg's hands for agreeing with him as Feeley Pendleton obtained by fighting." We do not think this is the language of a binding contract, or that it furnished a standard of certainty that would make an enforceable contract. The minds of the parties evidently did not meet upon the meaning of the word "losses." Turner understood it to mean that his lost profits of the voyage, as well as the expenses, were to be repaid. Amberg understood it to mean out of pocket expenses and demurrage for the time the Bullard lost, while it was applied to the interrupted voyage.

In view of this misunderstanding as to what was to constitute "losses," it is clear that the losses were not capable of ascertainment by any means, except a new and subsequent agreement between the parties, and did not come within the rule that that is certain which can be made certain. There was no agreed-upon basis by the use of which the amount of the losses could be arrived at by calculation. The differing amounts subsequently proposed by the parties, as representing plaintiff's losses, were not merely due to difference of calculation but to different bases for calculation. The statement of Turner that he would go into it on the understanding that he was to be accorded the same treatment for agreeing that Pendleton might obtain by fighting shows that there were negotiations for an allowance but no consummated contract. The fact that there were subsequent conferences held between the parties in November, at which the matter was again threshed out, and at which it is not claimed a contract was made, militates against the idea that a complete and binding contract was entered into at the first conference. If there had been, there would have been no need for the subsequent conferences.

Looking at the correspondence, there were times when one party came to a proposition that had theretofore been made by the other party, and then rejected by the former; but there was no time when both parties, at the same time, agreed to one and the same proposition. The fluctuating proposals made between the parties are inconsistent with the idea that a final and binding agreement had been in existence since their first meeting. The evidence shows that an endeavor was made by Amberg, acting for his principal, to induce the owners of all the sailing ves-

sels, the voyages of which were interrupted along with that of the Bullard, to accept an allowance of their actual expenses, to be paid as a deduction from the freight money that was agreed to be paid by Lunham & Moore for the retransportation of the cargoes. Whether this allowance was as a matter of grace or a matter of contract need not be considered here, because it was never accepted by the plaintiff. The plaintiff may have a moral claim for reimbursement, but we do not think that the plaintiff has a binding contract that can be recognized in a legal action.

[2, 3] The remaining question is whether there was a consideration for the alleged agreement. The plaintiff asserts two legal considerations. The first is the release of the cargo of oil, which was in the possession of the plaintiff, at the time of the termination of the charter party. There are two answers to this contention. At the time of the alleged making of the agreement sued upon, the cargo of oil had already been released to Lunham & Moore. Further, bills of lading had never been signed for it, and the plaintiff was not entitled to a lien on it. The plaintiff also asserts as a consideration, his alleged agreement not to litigate with Lunham & Moore for a breach of the charter party, caused by the interruption of the voyage. In order that this be a legal consideration, there must have been a bona fide ground for the litigation.

[4] In view of the terms of the charter party, we are unable to conclude that the plaintiff had any color of claim against Lunham & Moore, or their principals, because of the termination of the voyage after the proclamation of the President. The Bullard was given a permit to carry the cargo, but after the proclamation of the President the permit was revoked and clearance denied to it. The charter party provides: "This charter made subject to charterer receiving American government permit to ship cargo." As it is undisputed that the charterer was ultimately denied a permit to ship the cargo, it is patent that the charter was thereby abrogated, and the parties to it released by its very terms.

We conclude that the record shows that the contract sued on was never entered into by the parties, and would have been without legal consideration, if entered into, and that the plaintiff had no cause of action, and that the defendant was entitled to a directed verdict.

The judgment of the District Court is reversed, and the cause remanded for further proceedings in conformity with this opinion.

Reversed.